UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARTIN BRADLEY, III,

Movant,

v.                   4:13-cv-121
                     4:05-cr-59

UNITED STATES OF AMERICA

Respondent.

## ORDER

## I.     INTRODUCTION

Martin Bradley, III moves the Court under 28 U.S.C. § 2255 to vacate his convictions and sentence for (1) conducting the affairs of an enterprise through a pattern of racketeering activity; (2) conspiracy to commit racketeering; (3) conspiracy to defraud Florida Medicaid; (4) defrauding Florida Medicaid; (5) conspiracy to defraud California Medicaid ("Medi-Cal"); (6) defrauding Medi-Cal; (7) conspiracy to commit money laundering; (8) money laundering; and (9) failure to file a report of foreign financial transactions while committing mail fraud, wire fraud, and money laundering. See ECF Nos. 532; 740.[1]

Bradley makes a bevy of arguments to support his motion, including that (1) he received ineffective assistance of counsel both at trial and on direct appeal; (2) multiple issues with the jury and the Court's instructions denied him due process, a fair trial, and an impartial jury; and (3) the Court

imposed an unconstitutional sentence. See ECF No. 1494. After carefully considering all of Bradley's claims and arguments, as well as the Government's response, the Court finds no reason to vacate Bradley's convictions and sentence and so *DENIES* the present motion.

## II.    BACKGROUND

This section begins by outlining the fraudulent scheme that underlay Bradley's convictions. It then relates the trial proceedings in some detail, focusing particular attention on the Court's jury instructions and communications with the jury. Finally, this section concludes with a brief portrait of Bradley's sentencing and the Eleventh Circuit's appellate opinion in Bradley's direct appeal.

### A. Recycling: It's Not Just For Environmentalists

The Eleventh Circuit has already succinctly described the fraudulent scheme at the center of this motion that Bradley and his codefendants perpetrated.

This case involves multiple schemes to defraud the Florida and California Medicaid programs by causing them to pay for blood-derivative medications . . . more than once. Martin J. Bradley III and his father . . . owned Bio-Med Plus, Inc. . . . . a Miami-based pharmaceutical wholesaler that purchased and sold blood-derivatives. Beginning in 1996, in addition to purchasing blood-derivatives from drug manufacturers, the Bradleys had Bio-Med purchase blood-derivatives that had not been administered to the

---

[1] All record citations are to the docket in *United States v. Bradley et al.*, No. 4:05-cr-59 (S.D. Ga.).

patients for whom they had been prescribed and place those blood-derivatives in its inventory. Most of these patients were eligible for Medicaid . . . and Medicaid had paid for their prescriptions. Bio-Med thereafter sold the unused blood derivatives to pharmacies in Florida and California. The pharmacies, in turn, used them to fill prescriptions and then, in most cases, obtained reimbursement from the states' Medicaid programs.

*United States v. Bradley*, 644 F.3d 1213, 1226-27 (11th Cir. 2011).

This recycling of blood-derivatives lay at the core of the indictment against Bradley. Specifically, the Government alleged that Bradley committed mail and wire fraud in causing Florida and California Medicaid programs to purchase the recycled drugs. *Id.* at 1236; ECF No. 1494 at 4. Those acts of mail and wire fraud, in addition to comprising substantive counts in the indictment, also served as predicate acts for the racketeering counts against Bradley. *See, e.g.*, ECF No. 532 at 24. So, as the Eleventh Circuit recognized, if the Medicaid programs were not the victims of fraud, none of Bradley's convictions can stand. *Bradley*, 644 F.3d at 1236.

### B. The Trial

After many pre-trial machinations from an armada of renowned defense attorneys cooperating with each other, the Court tried Bradley and his codefendants before a jury in 2006. *See* ECF No. 659. The Government presented extensive evidence of Bradley's fraud, including testimony from

three witnesses that Florida and California Medicaid agencies would not knowingly pay for recycled blood-derivatives. ECF No. 1494 at 4. Douglas Hillbloom, the former chief of Medi-Cal's contracting section, testified that Medi-Cal does not allow for the same drug to be paid twice. ECF No. 661 at 285. Hillbloom also testified that blood factor medications dispensed to patients could not be returned to pharmacies for credit back to Medi-Cal because Board of Pharmacy storage condition regulations prohibit return of medications once they leave a pharmacy's control. *Id.* at 284-85.

Harry Fry, an employee with the California Department of Health Services, testified that (1) California's Genetically Handicapped Persons Program ("GHPP") did not allow for payment of drugs for use by anyone but the person to whom they were originally dispensed, and (2) GHPP would not pay for the same drug twice. *Id.* at 299-300. Finally, Jerry Wells, Bureau Chief of Pharmacy Service for Florida Medicaid, testified that (1) Florida Medicaid would only pay for the same drug twice in fraudulent situations; (2) pharmacy regulations prohibited dispensing drugs without patients present; and (3) Florida Medicaid would only unknowingly pay for a drug that was never administered to a patient. ECF No. 665 at 220-21.

Bradley, on the other hand, argued that he committed no fraud at all and focused his defense on the requirement that he have knowledge of his misrepresentation's falsity. ECF No. 682 at 32 (arguing that Bradley "never thought he was doing anything wrong"). Notably, Bradley did not directly argue that any misrepresentations he or Bio-

Med may have made were not material. *But see* ECF No. 540 at 2 (requesting jury instruction that absence of Medicaid regulations prohibiting recycling necessitated acquittal on mail and wire fraud charges). And in response to testimony that Florida and California Medicaid would not knowingly pay for recycled drugs, Bradley's counsel conducted limited cross-examination of Hillbloom, ECF No. 661 at 287-88, and no cross of Fry or Wells.

### 1. *The Jury*

The jury in Bradley's trial sent many notes and the Court engaged in communications, both written and oral, with the jury many times. Many of Bradley's claims surround these notes and their disclosure to the parties. This subsection divides the notes into pre- and post-closing argument categories, and then again by day of deliberation for the post-closing notes and communications.

### a. Pre-closing argument jury notes and communications

On just the third day (out of twenty-three) of trial, the Court received the first note from the jury. From Juror Smith, the note stated that two people on the jury made statements that "they will make sure defendants go to jail." ECF No. 1019 at 5. In response, the Court convened a meeting in chambers with counsel for the Government and all defendants. *Id.* at 4. Over defense counsel's objection, the Court declined to conduct meetings with individual jurors, *id.* at 6-7, instead instructing the jury as a whole in open court on the presumption of innocence and their oath to abstain from deliberating until the end of the case. ECF

No. 662 at 281-82. The Court then polled the jury individually on whether they could follow those instructions, to which all jurors answered yes. *Id.* at 282-83.

Bradley's trial counsel also avers that a few weeks later, a juror arrived late on St. Patrick's day. ECF No. 1494-5 at 3. Without any affidavit or other evidence as support, Bradley then alleges in his brief that the Court admonished the juror in chambers without either party or their counsel present. ECF No. 1497 at 31.

Before the close of evidence, the jury sent several other notes, among them one from Juror Smith thanking the Court for expediting his receipt of pain medicine, ECF No. 568; a note from Smith seeking leave to take medicine for spasms, ECF No 567; two notes requesting time off to participate in an in-law's wedding, ECF Nos. 566; 579; and a note requesting an excuse from work because the juror worked at Home Depot, which Bradley's father, a co-defendant, frequented. ECF No. 580. Bradley claims his counsel had no notice of these notes.

### b. Post-closing argument jury notes and communications

After the parties rested and made their closing arguments, the Court gave extensive instructions to the jury and sent them to the jury room adjacent to the courtroom. *See* ECF No. 682 at 232-37. At that time, the Court made clear that the jury would not begin deliberations until they arrived at a room in the basement of the courthouse where all the evidence from trial sat ready. *Id.* at 232. With the jury gone, the Court then took up, and denied, a defense objection to the Government's closing argument. *Id.*

3

at 235-37. Defense counsel also objected to the Court's use of a bank robbery example to illustrate conspiracy because it allegedly omitted the overt act requirement of a non-drug conspiracy. *Id.* at 238. In response, the Court brought the jury, minus the three alternate jurors and Juror Smith, who was in the latrine, back into the courtroom and reinstructed them on overt acts. *Id.* at 238-39.

With the jury minus juror Smith in the courtroom, an individual juror asked the Court if the jury could inquire about a "direct problem" or if it needed to write a note. *Id.* at 239. The Court indicated that the jury needed to submit a written note, which they could do when they arrived at their deliberation room in the basement of the courthouse. *Id.* Juror Smith then emerged from the latrine and the Marshall took the entire jury, Smith included, down to its deliberation room to write the note about the "direct problem." *Id.* The Court directed the Marshall to return the jury to the courtroom once they finished the note. *Id.* at 239-40.

After a brief recess, the Court began discussions with counsel regarding Juror Smith and the Court's suspicions that the jury note would request his removal. *Id.* at 240. Five pages of transcript later, the jury note arrived and Court read it to counsel for both sides. *Id.* at 245. As the Court suspected, it requested Juror Smith's removal. *Id.*

A short pause in the proceedings ensued as the Court waited for the Marshal to bring Smith to the courtroom. *Id.* at 246. The Court then discussed with Smith his capacity to remain on the jury and ultimately removed him, substituting juror Frazier in Smith's

place. *Id.* at 246-49. The Court told Frazier that she was "now on the jury," and that every caution and instruction given applied to her. *Id.* at 249. Immediately after that admonition, the Marshal escorted Frazier to the jury's room where deliberations presumably began upon her arrival. *Id.* The Court never gave its corrective instruction on overt acts to Frazier before she left to deliberate.

i. March 23, 2006—Jury Deliberations, Day One

The first day of deliberations, after the removal of Smith and addition of Frazier to the jury, brought several jury notes. First, the jury asked for a chalk board and a dry erase board. ECF No. 572. The Court responded, "[t]his material is on the way." *Id.* Second, the jury requested copies of the trial transcript. ECF No. 569. The Court informed the jury that no transcript yet existed and requested that the jury recall the testimony through their collective memory. ECF No. 570. Fifteen minutes later, the jury requested a smoke break, which the Court granted. ECF No. 571. Finally, the Court sent a note to the jury inquiring how long they wished to deliberate that first night, to which the jury replied that they wished to leave for the evening. ECF No. 573. For all of these notes, the record does not reflect that the Court consulted the parties or their counsel before responding.

ii. March 24, 2006—Jury Deliberations, Day Two

Day two of deliberations brought several more notes from the jury. At 10:00 am, the jury informed the Court that the men's restroom "has begun spraying water against

4

the wall and on floor." ECF No. 591. In that same note, the jury also requested a dictionary. *Id.* The Court told the jury a plumber had been called, but that a dictionary would not be provided. Instead, the Court stated that "[y]ou have the charts and exhibits which are replete with definitions. You also have the charge and summary charts." *Id.* The record again does not reflect the Court consulting counsel before responding.

After lunch that second day, the jury requested another smoke break due to deliberations "getting a little stressful." ECF No. 574. As with the note requesting a dictionary, the record does not reflect a response from the Court. And at 5:40 p.m., the jury sent out its most substantive note to date, asking "[d]o you treat the company and the owner of the company differently in the acts? Because we are confused on how to distinguish between the company and the individual." ECF No. 589.

The Court held an in-chambers meeting with counsel[2]—but not Bradley or the other defendants—to discuss the note. *See* ECF No. 1019 at 8-12. The parties and the Court reached a compromise on the proper response, with the Court instructing the jury that "the owners and the corporation are separate defendants," with a corporation only able to "act through its agents who can be its owners, employees, etc." ECF No. 590.

iii. March 25, 2006—Jury Deliberations, Day Three

The next day the Court sent the jury an unprompted note stating the Court's willingness to provide additional clarification on the corporation-individual distinction. ECF No. 592. The note also reiterated that corporations can only act through their agents and employees, but omitted the original note's declaration that corporations and owners are separate defendants. *Id.* Later that afternoon, the Court sent another unprompted note, this time to ask the jury when they wished to arrive the next morning and whether they wanted a devotional service. ECF No. 575. The third day of deliberations ended shortly thereafter when the jury sent the Court another note stating that one juror felt ill and deliberations needed to stop for the day. ECF No. 593.

iv. March 26-27, 2006—Jury Deliberations, Days Four and Five

Day four saw no notes from the jury. But it did bring an in-chambers meeting about the Court's desire to provide the jury a supplemental instruction to clarify any trouble they had distinguishing racketeering counts from racketeering acts. *See* ECF No. 594 at 1. Counsel for both Bradley and the Government objected to the proposed instruction, the Government on grounds that the new instruction might slow down deliberations, Bradley because he thought the instruction might improperly push the jury in one direction or another. ECF No. 1019 at 13.

---

[2] The transcript of this meeting reflects that the jury sent its note about corporations on March 22, 2006. ECF No. 1019 at 8. But the jury note itself is dated March 24, ECF No. 589, as is the Court's response. ECF No. 590. The Court considers it far more likely that the transcript contains an erroneous date and so finds the date of the corporations note and response to be March 24, 2006.

The next morning, at the start of day five, the Court determined it would give the instruction to help the jury manage the sheer volume of counts in the indictment. *Id.* at 16. Bradley's counsel again objected, this time on grounds that the charge omitted some of the elements of racketeering. *Id.* at 17. Other defendants' counsel made additional objections, as did the Government. Ultimately the Court gave the instruction over those objections. *See* ECF No. 594.

The bulk of the new instruction addressed the difference between racketeering counts and racketeering acts. At the beginning and end, however, the Court wrote that it was not restating its prior instructions and that all of those remained in effect. *Id.* at 1. The Court also instructed, consistent with its "instructions and the verdict," that the jury "must reach a verdict of 'guilty' or 'not guilty' as to each defendant and as to each of the 258 counts." *Id.* The record indicates that the jury never responded to the note or asked any questions related to its contents.

The afternoon of day five brought one last note, this time from two individual jurors who sought permission to call their families directly. ECF No. 595 at 2. The Court granted those requests. *Id.* at 1. As with the other non-substantive jury notes, the record does not reflect that the Court consulted counsel. Finally, the last jury note on the docket came on March 29, 2006, when the jury told the Court it had reached a verdict. The Court, of course, informed the parties of that note.

## C. Sentencing and Appeal

After at times exhausting deliberations, the jury convicted Bradley on the vast majority of the counts against him. After a pre-sentence investigation, the Court concluded that for purposes of the Sentencing Guidelines, Bradley's total offense level was 46 with criminal history category of I. *See Bradley*, 644 F.3d at 1284-85. For Count One, those calculations resulted in a Guidelines range of life imprisonment. Bound by the statutory maximum for a RICO[3] offense, the Court imposed a sentence of 240 months on Count One. ECF No. 740 at 4. It also imposed a sixty month sentence for Count 284, to run consecutive to the sentence for Count One.[4]

Well within the fourteen days allowed, Bradley appealed the Court's judgment. ECF No. 753. On appeal, Bradley argued that (1) the evidence presented was insufficient to establish that he committed the crimes alleged; (2) "the Government failed to make out a case under the statute requiring the reporting of foreign financial transactions"; (3) the Court improperly dismissed juror Smith and, separately, refused to investigate Smith's report that two jurors refused to presume Bradley innocent; and (4) the Court erred in calculating his Guidelines sentencing range. *Bradley*, 644 F.3d at 1236, 1283. Although the Eleventh Circuit agreed that the Court miscalculated the proper Guidelines range, it affirmed

---

[3] RICO stands for Racketeering Influenced and Corrupt Practices Act. 18 U.S.C. § 1961-68.

[4] The Court also sentenced Bradley on his panoply of other convictions. *See* ECF No. 740 at 4. But those sentences run concurrently with the sentences for Counts One and 284, *see id.*, and so Bradley's total sentence remains 300 months.

Bradley's convictions and sentence. *Id.* at 1311.

Bradley pursued a petition for rehearing en banc, arguing for resentencing on remand.[5] ECF No. 1494-6 at 29. Because the Court effectively departed downward from the Guidelines when it sentenced him, Bradley reasoned the Court should have the opportunity to depart again in proportion to the decrease in his newly decreased Guidelines range. *Id.* The circuit denied his petition for rehearing and so affirmed, again, Bradley's sentence.

While awaiting the panel decision in *Bradley*, Bradley filed a motion for a new trial. ECF No. 1221. This Court denied the motion, ECF No. 1232, and the Eleventh Circuit affirmed that denial the year after it issued its opinion in *Bradley*. *See United States v. Tellechea*, 478 F. App'x 605 (11th Cir. 2012). Bradley then petitioned for certiorari in the Supreme Court, seeking review of his conviction and sentence. *Pet. Writ Cert., United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011), 2012 WL 106508. That Supreme Court denied that petition on May 14, 2012, *Bradley v. United States*, 132 S. Ct. 2375, and Bradley filed the present § 2255 motion almost exactly one year later. *See* ECF No. 1494.

### III. DISCUSSION

28 U.S.C. § 2255 allows federal prisoners to collaterally attack their convictions and sentences "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." If a court finds "that the sentence

imposed was not authorized by law . . . or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside." *Id.* at (b).

Bradley asserts eight grounds to justify vacating his convictions and sentence. First, he claims his trial counsel provided ineffective assistance because "he failed to investigate and develop legal arguments regarding materiality, even though . . . materiality is an essential element of mail and wire fraud." ECF No. 1494 at 10. Second, Bradley alleges ineffective assistance by his appellate counsel for failure to argue materiality on appeal. *Id.* at 12.

Third, Bradley claims that various issues with the jury, including the instructions given and the Court's ex parte communications, denied him due process, a fair trial and impartial jury, and his right to be present at all significant proceedings. *Id.* In ground four, Bradley alleges ineffective assistance of trial counsel based on counsel's failure to discover the Court's ex parte communications with the jury, object to them, or raise them as grounds for a new trial, mistrial, or other relief.[6] *Id.* at 13-14. Ground five sees Bradley alleging ineffective assistance of trial counsel again, this time based on counsel's failure to object to Juror Smith's dismissal "on the basis that jury deliberations had already begun before"

---

[5] Bradley also pursued Fourth Amendment arguments unrelated to this motion. *See* ECF No. 1494-6.

[6] Bradley makes Ground Four conditional on the Court finding that his trial counsel should have discovered the ex parte communications. ECF No. 1494 at 13.

the dismissal and replacement of Smith with an alternate. *Id.* at 14.

In ground six, Bradley argues that his appellate counsel provided ineffective assistance by failing to raise the following issues related to the jury: (1) the Court's undisclosed communications with the jury; (2) "the cumulative effect of the conditions under which the jurors served on Bradley's right to a fair trial"; (3) various concerns surrounding the supplemental RICO instruction the Court gave; (4) juror Smith's dismissal *after* deliberations began; and (5) the improper substitution of an alternate juror in violation of Federal Rule of Criminal Procedure 24. ECF No. 1494 at 15-16.

In ground seven, Bradley again alleges ineffective assistance of appellate counsel, this time for counsel's failure to argue that the Sixth Amendment required remand for resentencing. *Id.* at 17. Finally, in ground eight, Bradley argues that his sentence itself is unconstitutional because the Eleventh Circuit's failure to remand denied him his Sixth Amendment right to argue for a below-Guidelines sentence. *Id.* at 17-18. In order to comply with *Clisby v. Jones*, 960 F.2d 925, 934 (11th Cir. 1992),[7] the Court addresses each of Bradley's claims in the order presented above.

## A. Ineffective Assistance of Trial Counsel – Materiality

Bradley first argues that his trial counsel provided ineffective assistance because counsel "failed to investigate and develop . .

. exculpatory evidence" on the issue of whether Bradley's failure to disclose the recycled status of the drugs sold was material to the Medicaid programs' decision to pay for the drugs. ECF No. 1497 at 4. Bradley argues that (1) mail and wire fraud, the criminal acts underlying Bradley's racketeering conviction, require falsehoods to be material; (2) the Government presented flimsy proof of materiality; (3) strong evidence of immateriality existed; and (4) therefore trial counsel's failure to investigate and present that strong evidence constituted ineffective assistance. *Id.* at 4-5.

Bradley contends that four pieces of evidence demonstrate that Florida and California Medicaid, at the time of Bradley's fraudulent scheme, permitted payment for recycled drugs. *Id.* at 10. First, Bradley points to a 1985 Office of Inspector General audit report ("OIG report") that allegedly establishes that Florida and California allowed drug recycling. *Id.* at 12-13. Second, he cites two Third Circuit decisions acknowledging the import of the OIG report's findings. *Id.* at 14. Third, Bradley argues that Congress's adoption of legislation to close the recycling loophole demonstrates that Medicaid allowed recycling before the legislation's enactment. And fourth, Bradley argues that Florida and California administrative law would have required the formal promulgation of a rule to prohibit Medicaid coverage for recycled drugs and that since neither state had such a rule, neither prohibited recycling. *Id.* at 16-17. If his counsel had only "investigated and exploited" those four pieces of evidence to attack the Government's "thin" materiality evidence, Bradley believes he "would not

---

[7] *Rhode v. United States*, 583 F.3d 1289, 1291 (11th Cir. 2009), held that *Clisby*, which addressed a 28 U.S.C. § 2254 petition, applies equally to § 2255 motions like Bradley's. *Long v. United States*, 626 F.3d 1167, 1169 (11th Cir. 2010).

have been found guilty of mail and wire fraud." *Id.* at 7, 10.

### 1. *Legal Standard*

"[T]o establish constitutionally ineffective counsel, a defendant must show that (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced the defense." *Puiatti v. Sec'y, Fla. Dep't of Corrs.*, 732 F.3d 1255, 1278 (11th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To determine performance deficiency, courts ask "whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Id.* at 1278-79.

But "judicial scrutiny of an attorney's performance is appropriately highly deferential," and "must indulge a strong presumption that counsel's conduct" was proper. *Id.* at 1279. In fact, "to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel [took]." *Id.* While the Constitution guarantees competent counsel, "[i]t does not insure that defense counsel will recognize and raise every conceivable . . . claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982).

### 2. *Application*

Bradley urges that his trial counsel's performance was deficient because counsel "completely overlooked the essential element of materiality and failed to investigate, much less present, crucial evidence that would have created a reasonable doubt about materiality." ECF No. 1497 at 25. In response, the Government argues that Bradley, in essence, mischaracterizes his counsel's arguments to manufacture an ineffective assistance issue.[8] *See* ECF No. 1505 at 25-27.

At trial, counsel presented expert testimony that no state regulations existed prohibiting recycling, *see* ECF No. 676 at 82, 108, and argued that the Government failed to prove the drugs at issue were in fact recycled. ECF No. 682 at 14, 16. Building on that, counsel ultimately chose to undermine the Government's recycling theory by arguing that Bradley never misrepresented the recycled nature of the blood-derivatives and thus never committed fraud. Doing so was not deficient performance.

Both mail and wire fraud require a defendant to knowingly make a misrepresentation that relates to a material fact. *See* 18 U.S.C. §§ 1341, 1343; *Neder v. United States*, 527 U.S. 1, 4 (1999) (holding "that materiality is an element of the federal mail fraud [and] wire fraud" statutes). Arguing no materiality thus is one of many ways to defend against a fraud charge.

---

[8] The Government spends a substantial portion of its response to Bradley's ineffective assistance-materiality claims arguing that Bradley suffered no prejudice because his convictions rested on theories of fraud distinct from the recycling theory Bradley highlights. *See* ECF No. 1505 at 4-12. While true, the Court cannot parse the jury's general verdict to determine which theory of fraud it relied on in convicting Bradley of mail and wire fraud. And without knowing what theory of fraud the jury used to convict, any potential error as to one theory must be assessed to determine whether it had a "substantial and injurious effect or influence in determining the jury's verdict." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008). That said, the Government's cogent and persuasive argument that counsel's performance was not deficient makes addressing its weaker prejudice argument unnecessary.

Materiality may even have been a meritorious argument to make in this case. But it was not the only one.

Another avenue of attack, and the one Bradley's counsel chose, is to argue no misrepresentation occurred in the first place. Although not preclusive of an argument on materiality, arguing no misrepresentation in some sense sidelines a materiality argument. The two defenses often are alternatives instead of companions.

Such in-the-alternative arguments play better to courts in written briefs, not to human juries tasked with understanding unfamiliar legal concepts, particularly in cases like Bradley's where the volume of evidence and complexity of the issues threatens to overwhelm. That Bradley's counsel chose to streamline his defense by arguing Bradley never made a fraudulent statement instead of contesting materiality cannot be ineffective assistance absent a materiality smoking gun staring counsel in the face. So, even without examining the evidence supporting the two arguments, the very relationship between misrepresentation and materiality as elements of fraud suggests that arguing one (misrepresentation) instead of the other (materiality) often will be effective assistance of counsel, particularly in light of the presumption "that counsel made all significant decisions in the exercise of reasonable professional judgment."[9]

[9] Bradley contends that not raising materiality could not have been a strategic decision because "no reasonable strategy" could have included "remaining mute about a gaping hole in the government's case." ECF No. 1497 at 27. First, materiality was not a gaping hole. The Government presented three witnesses who provided testimony on that point and the Eleventh Circuit confirmed that evidence was

*Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (internal quotations omitted).

Looking at the materiality evidence Bradley presents compared to the misrepresentation evidence admitted at trial only reinforces that conclusion. The OIG report he leans on merely concludes that seven states, including Florida and California, permit recycling of some drugs without crediting Medicaid for payments made at the original dispensing. *See* ECF No. 1494-1 at 2. The report does not specify which drugs can be recycled, nor whether Florida and California permit recycling of blood-derivatives.

Bradley contends the OIG report rebuts Douglas Hillbloom's testimony that Medi-Cal did not allow dispensed medications to be returned to pharmacies. ECF No. 1497 at 13. But that mischaracterizes Hillbloom's testimony. He stated that Board of Pharmacy regulations did not permit *blood factor medications* to be returned after dispensing to patients. ECF No. 661 at 284. He testified specifically about those medications, not about California's general policy on recycling and Medicaid reimbursement. Given the OIG report's very generalized assertion that certain states

sufficient to support Bradley's conviction. *See Bradley*, 644 F.3d at 1249-50. And second, nothing in the record (other than Bradley's assertion) suggests counsel "simply misunderstood the importance of the materiality issue and did not recognize the opportunity to point out the defect in the government's theory." ECF No. 1497 at 27. Absent any evidence pointing in the direction of a gaff by Bradley's trial counsel, the Court is bound to presume that the decision not to argue materiality extensively constituted part of a calculated trial strategy. *See Puiatti*, 732 F.3d at 1279.

permit recycling, Hillbloom's testimony may in fact be entirely consistent with the report. Either way, the OIG report does not alone or in conjunction with Bradley's other materiality evidence so undermine the Government's materiality witnesses that a failure to present the report at trial constituted deficient performance.

The two Third Circuit cases Bradley points to as recognizing the importance of the OIG report also do not suggest trial counsel's decision not to argue materiality constituted deficient performance. *United States ex rel Quinn v. Omnicare*, 382 F.3d 432, 441 (3d Cir. 2004), and *In re Genesis Health Ventures, Inc.*, 112 F. App'x 140, 145 (3d Cir. 2004), both False Claims Act cases, simply held that in the absence of state regulations prohibiting drug recycling, billing Medicaid programs a second time cannot give rise to a misrepresentation. Both cases addressed New Jersey Medicaid and thus contained no discussion of the pharmacy policies and regulations for blood-derivatives in Florida and California. *In re Genesis Health Ventures* mentions the OIG report, but only to note that Medicaid regulations at the federal level do not require credit to Medicaid for recycling of reusable drugs.[10] 112 F. App'x at 142 n.4.

Congress' adoption in 2006 of a ban on Medicaid paying twice for recycled drugs likewise does not bolster a materiality argument to the degree that a failure to argue it would constitute deficient performance.

That Congress, after the *Omnicare* decision and OIG report, became concerned about double payments and legislated to correct that loophole only shows that in some states, for some drugs, recycling could not give rise to claims of fraud. It says nothing about California or Florida policies against recycling of blood-derivatives.

Finally, Florida and California administrative laws do not so fatally undermine the Government's materiality evidence as to make Bradley's counsel's failure to contest it more vigorously deficient performance. Both states require that all rules and regulations be adopted consistent with formal procedures. *See* Fla. Stat. § 120.54(1)(a); Cal. Gov. Code § 11340.5(a). Rules not adopted in the prescribed manner are unenforceable. *See* Cal Gov. Code § 11340.5(a); *Fla. Dep't of Fin. Servs. v. Capital Collateral Reg'l Counsel-Middle Region*, 969 So. 2d 527, 530 (Fla. 1st Dist. Ct. App. 2007) (per curiam).

As Bradley sees it, those administrative requirements directly undermine the testimony of Hillbloom, Fry, and Wells that Florida and California did not permit recycling of blood-derivatives. Because those witnesses did not cite to specific, promulgated rules, Bradley argues that had trial counsel presented the administrative laws outlined above, the Government's case on materiality would have fallen apart and seen Bradley acquitted. *See* ECF Nos. 1497 at 18; 1508 at 4. Regardless of whether that's true, and that Court doubts that it is, a conclusion that counsel performed deficiently does not follow.

The Eleventh Circuit has already addressed this issue. That court "disagree[d]

---

[10] Notably, Hillbloom testified that storage issues with blood-derivatives motivated California's regulations prohibiting return of those drugs once dispensed. ECF No. 661 at 284-85. Common sense seems to indicate that such drugs might not qualify as reusable.

with Bio-Med's contention that it was permitted to resell recycled blood-derivatives in the absence of an express written regulation forbidding it" because "Bio-Med knew that its conduct would cause the Medicaid programs to reimburse for medication they did not intend to cover." *Bradley*, 644 F.3d at 1242 n.64. The same holds for Bradley, even if counsel had raised the administrative law concerns Bradley asserts now. If Bradley knew that Florida and California Medicaid would not reimburse for blood-derivatives they knew to be recycled—and the jury found that Bradley did—the absence of a rule conforming to those states' administrative laws matters not. *See id.*

The OIG report, Third Circuit opinions, 2006 legislation closing the "recycling loophole" in Medicaid regulations, and tenets of Florida and California administrative law that Bradley presents certainly qualify as relevant pieces of evidence on the issue of materiality. But they are not so overwhelming that choosing to argue misrepresentation instead of materiality rises to ineffective assistance. The evidence Bradley presented on misrepresentation—that no state regulations existed prohibiting recycling, for example—was at least as strong as the evidence of immateriality Bradley now offers.

Given that fact and the relationship between the misrepresentation and materiality elements of fraud, the Court cannot say that counsel's decision not to address (or address only slightly)[11]

---

[11] Bradley's trial counsel presented testimony from Ron Nicholson, an expert in Medicaid billing regulations. ECF No. 676 at 54-55. Nicholson

materiality fell outside the broad range of acceptable attorney conduct. The Sixth Amendment did not require Bradley's trial counsel to "recognize and raise every conceivable issue" and neither will this Court over seven years after a jury found Bradley guilty. *Engle*, 456 U.S. at 134. Bradley's ineffective assistance of trial counsel claim is *DISMISSED.*

## B. Ineffective Assistance of Appellate Counsel – Materiality

Bradley's second claim is that his appellate counsel also provided ineffective assistance by failing to address materiality on direct appeal. *See* ECF No. 1494 at 11-12. As Bradley's claim of ineffective assistance of trial counsel fails, so too does his claim regarding appellate counsel.

"Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*." *Dell v. United States*, 710 F.3d 1267, 1273 (11th Cir. 2013). So, Bradley must show that counsel's failure to raise the materiality issue on appeal fell outside the broad range of professionally competent assistance, and if it did, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [appeal] would have been different." *Id.*

Attorneys, however, are not required to raise every non-frivolous issue on appeal.

---

testified that he could find no California or federal regulation prohibiting recycling. *Id.* at 86-87. The jury convicted Bradley anyway. If direct testimony that no recycling prohibition existed failed to overcome the Government's materiality evidence, the new evidence Bradley now asserts likely would not either. At a minimum, the new evidence is not so glaring that a failure to present it would constitute deficient performance.

*See Jones v. Barnes*, 463 U.S. 745, 754 (1983). In fact, the most effective appellate advocates "emphasize[] the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible or at most on a few key issues." *Id.* at 751-52. It is "only when ignored issues are clearly stronger than those presented[] will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

The Court cannot say that the materiality issue Bradley raises is "clearly stronger" than the issues counsel presented on direct appeal. *Id.* Those issues generated a nearly one-hundred page published Eleventh Circuit opinion. Although Bradley did not prevail, the court took his arguments seriously. Not once did the opinion intimate that Bradley's issues presented or arguments lacked strength or vigorous presentation. Perhaps more importantly, the Court cannot find any reason to suspect that a materiality argument would have performed substantially better, particularly in light of the jury's rejection of Nicholson's testimony, which contradicted the Government's materiality evidence. *See, e.g.*, ECF No. 676 at 73.

The diversity of issues presented to the Eleventh Circuit also suggests that appellate counsel carefully probed the trial record for the strongest issues and selected those for argument. Counsel argued insufficiency of the evidence, attacked an issue surrounding juror Smith's dismissal, argued deprivation of a fair trial, and, like counsel on the present motion, argued for resentencing. Bradley's appellate counsel had a cornucopia of issues to raise—as shown so well by the many

grounds Bradley raises in this collateral attack—and chose those four, all of which were meritorious. Counsel either played darts blindfolded to select issues or decided that the ones ultimately briefed presented Bradley with the best opportunity to win.

With nothing more than Bradley's speculation that appellate counsel misunderstood materiality, the Court must presume that counsel's issue selection represents considered strategy and not deficient performance. *See Puiatti*, 732 F.3d at 1279. Bradley's claim of ineffective assistance of appellate counsel therefore is *DISMISSED*.

### C. Bradley's Jury-Related Claims

Bradley's third through sixth grounds for relief all surround communications between the Court and the jury. Bradley, however, failed to raise any of them on direct appeal.[12] This section first discusses the implications of that failure and then turns to whether the claims may proceed despite the initial procedural hurdle.

#### 1. *Procedural Default*

Defendants "generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004). That procedural bar "applies to

---

[12] Bradley raised one jury issue on appeal—whether the Court's refusal to conduct any investigation into Juror Smith's note about two other jurors prematurely deliberating, and the Court's dismissal of Juror Smith based on a jury note requesting his removal, violated Bradley's right to due process and an impartial jury. Bradley does not seek to relitigate that issue in this collateral proceeding.

all claims, including constitutional claims." *Id.* Only if a defendant can show either cause and actual prejudice, or actual innocence may he escape the consequences of failing to raise a claim on direct appeal. *See Galvez v. United States*, 515 F. App'x 855, 856 n.2 (11th Cir. 2013) (citing *Ward v. Hall*, 592 F.3d 1144, 1176 (11th Cir. 2010)).

Bradley does not contend, nor could he, that the actual innocence exception to the procedural default bar applies. But he argues extensively the cause and prejudice exception. Because the Court cannot ignore the possible error present in several of Bradley's jury-related claims, it discusses first the actual prejudice prong.

### a. Prejudice

Actual prejudice—at least in the context of reviewing a § 2255 motion—exists when a constitutional error "ha[s] a substantial and injurious effect or influence in determining the jury's verdict." *Trepal v. Sec'y, Fla. Dep't of Corrs.*, 684 F.3d 1088, 1114 (11th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

*Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995)).

Bradley's first jury-related complaint is that the many ex parte communications between the Court and jury prejudiced him through denials of due process, a fair trial, and an impartial jury. *See* ECF No. 1494 at 12-13. Some very well may have, some most certainly did not.

As Bradley correctly notes, *Rogers v. United States*, 422 U.S. 35, 38 (1975), established that a defendant and his counsel have the right "to be present and participate in any discussion between the judge and jury." *United States v. Betancourt*, 734 F.2d 750, 759 (1984); *accord* Fed. R. Crim. P. 43(a). Violations of that right, however, may not warrant reversal. *See United States v. Wright*, 392 F.3d 1269, 1280 (11th Cir. 2004) (citing *Rogers*, 422 U.S. at 40) (noting that violations of the right to be present can be harmless error). And, "[o]n *collateral* review, a federal constitutional error is harmless unless there is 'actual prejudice,'" as defined in *Brecht. Mansfield v. Sec'y, Dept. of Corrs.*, 679 F.3d 1301, 1307 (11th Cir. 2012).

> i. Miscellaneous ex parte communications between the Court and jury

Many of the ex parte communications between the jury and the Court did not cause Bradley any actual prejudice. The jury's request for a chalk board and dry erase board and the Court's response that the items were "on the way," *see* ECF No. 572, for example, could not have "made a difference between a guilty verdict and a judgment of acquittal." *Wright*, 392 F.3d at 1280 (holding that

district court response to jury's request for a ruler without informing counsel of the note or the court's response did not violate defendant's substantial rights).

So too for the jury's request for a transcript and the Court's response directing the jury to use their collective memory, ECF Nos. 569; 570; the jury notes requesting smoke breaks and the Court's provision of breaks without telling counsel, *see, e.g.*, ECF No. 571; the jury's requests to cease deliberations for the day, ECF No. 573; the Court's unprompted note to the jury asking when they wanted to arrive the next morning, ECF No. 575; the jury's request to end for the day due to illness, ECF No. 593; and the alleged dressing down of a juror in chambers for being late to court. *See* ECF No. 1494-5 at 3. None of these communications clarified the law, gave further instructions, or otherwise led the jury in a particular direction with its deliberations. *See Wright*, 392 F.3d at 1280. And while all of them likely constitute violations of Bradley's due process rights and right to be present, none of them caused Bradley actual prejudice.

Even considered collectively the notes do not give rise to a violation of Bradley's substantial rights. What they establish instead is a pattern of the Court quickly handling the more mundane jury requests without assembling counsel for multiple defendants from several off-site locations. The Court recognizes that pattern violated Bradley's constitutional right to be present,

but it cannot conclude that Bradley suffered any actual prejudice as a result.[13]

    ii.    Substantive ex parte communications between the Court and jury

Unlike the many miscellaneous, harmless, ex parte communications between the Court and jury, two ex parte communications addressed substantive matters. First, on day two of deliberations, the jury requested a dictionary. ECF No. 591. The Court denied the request and told the jury to look at "the charts and exhibits which are replete with definitions," as well as the Court's instructions and the summary charts. *Id.* Nothing in the record reflects that the Court consulted counsel on the response.

Bradley correctly points out that the Government alone prepared those summary charts and a majority of the exhibits. ECF No. 1497 at 36. In directing the jury to those items, the Court risked suggesting to the jury that they were reliable sources of information the Court approved of. And in directing the jury as it did, the Court undoubtedly focused the jury's attention on the Government's view of the case, whether the Court intended to or not.

Looking at the impact of the Court's response in "the total setting," the Court cannot say that the jury's judgment was not "substantially swayed" by the denial of

---

[13] Bradley suffered no actual prejudice from many of the jury notes sent during trial either. *See, e.g.*, ECF Nos. 566; 567; 572; 579; 580. Even if the notes contained substantive legal questions (they do not), the record reveals no response from the Court. Without a response, an ex parte communication violating Bradley's substantial rights cannot have occurred.

Bradley's right to be present. *Trepal*, 684 F.3d at 1114. If the Court had consulted with Bradley and his counsel before responding, counsel could have objected to the Court's proposed response and possibly reduced its focusing effect, or even any reference to the Government's summary charts.

The Government contends that to find actual prejudice from the Court's response to the dictionary note requires "a tenuous chain of speculative inferences." ECF No. 1505 at 37. That's a bit of an exaggeration. For starters, to say that the Court directed the jury to materials put together by the Government and containing the Government's take on the case is no inference at all. From there it only takes one or two not-so-speculative inferences to conclude that the Court's direction to the jury may have influenced how they viewed the evidence.

Given the sheer volume of evidence in this case, the Court's response to the jury's request for a dictionary focusing the jury on certain items prepared by the Government very well may have improperly influenced the verdict. Such an effect is not harmless and may constitute actual prejudice to Bradley.

A second ex parte communication also gives cause for concern. After responding to a jury note about the difference between a corporation and individual—a response the parties agreed on—the Court sent a follow up note to the jury. ECF No. 592. The Court told the jury it would provide additional clarification on the corporation-individual distinction if needed and reiterated that corporations can only act

through their agents. *Id.* But the Court omitted the portion of its original, agreed upon, response stating that corporations and individuals are separate defendants.

As with all the other ex parte communications between the Court and jury, the unsolicited corporations note violated Bradley's right to be present and respond. *See Rogers*, 422 U.S. at 38. And like the Court's response to the dictionary note, the corporations note likely was not harmless.

Unlike the court's ex parte communication in *Betancourt*, which the Eleventh Circuit found harmless because it merely restated law already in the jury's possession, the Court's unsolicited follow-up response to the jury's corporations inquiry arguably altered the law the Court set forth in its initial, agreed upon response. By omitting that portion of the initial response to the jury's note that emphasized the separateness of individuals and corporations, the Court may have unduly linked the liability of corporations to the actions of its agents. More importantly, the Court cannot say the incompleteness of its unsolicited follow-up note did not deprive Bradley of substantial rights by pressing the jury to find Bradley guilty if it also found corporate liability for Bio-Med. *See Trepal*, 684 F.3d at 1114.

iii. Other jury issues resulting in actual prejudice

The Court's decision to give a supplemental RICO instruction over the objections of both Bradley and the Government may have coerced the jury's verdict and therefore likely also caused

Bradley actual prejudice.[14] Jury instructions are impermissibly coercive if they "appear[] to give a jury no choice but to return a verdict." *United States v. Jones*, 504 F.3d 1218, 1219 (11th Cir. 2007) (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)). Nevertheless, the allegedly offensive instruction is not viewed in isolation, "but rather in light of the overall charge." *United States v. Brokemond*, 959 F.2d 206, 208 (11th Cir. 1992).

The Court's supplemental RICO instruction stated that the jury should have known from the "instructions and verdict [that they] must reach a verdict of 'guilty' or 'not guilty' as to each defendant and as to each of the 258 counts." ECF No. 594 at 1. As in *Jenkins*, where the Supreme Court held coercive the statement "you have got to reach a decision in this case," here the Court in essence required a particular outcome by stating the jury "must" reach a verdict. But the jury had to do no such thing. In the

exercise of their honest consciences, the jury could have remained split, unable to reach a verdict of guilty or not guilty. *See United States v. U.S. Gypsum Co.*, 550 F.2d 115, 132 (3d Cir. 1977) *aff'd*, 438 U.S. 422 (1978) ("The possibility of a hung jury is as much a part of our jury unanimity schema as are verdicts of guilty or not guilty.").

That the Court gave the supplemental instruction over the objections of both parties and without the jury informing it of potential deadlock only strengthens the case for coercion. The Court assumed the jury needed help wading through the voluminous counts and issues. That assumption, when given the Court's imprimatur, could have led the jury to believe the Court thought a particular result should have been reached by the time it gave the instruction. And when combined with the instruction's plain language—"you must reach a verdict of 'guilty' or 'not guilty'"—that assumption leads to the conclusion that the instruction, in light of the overall charge, impermissibly coerced the jury and therefore caused Bradley actual prejudice.

iv.     Jury issues Bradley raises that caused him no actual prejudice

Bradley raises two other jury issues, neither of which caused him actual prejudice. First, he claims that the Court dismissed juror Smith after deliberations began and then failed to instruct the jury to restart deliberations after the substitution of an alternate. ECF No. 1494 at 14. The Court admittedly never instructed the jury to restart deliberations. But a close examination of the record reveals this is because the jury never started deliberations.

---

[14] In addition to impermissible coercion, Bradley argues that the supplemental instruction "unnecessarily and inaccurately simplified the RICO elements," thus altering the law given in the original instruction. ECF No. 1497 at 39. But the instruction bracketed its discussion of the RICO counts and racketeering acts by stating that the Court's original instructions—which fully outlined the elements of a RICO offense—remained in effect. *See ECF* No. 594 at 1. The supplemental instruction, moreover, stated that to reach a verdict on the RICO counts, the jury "must determine whether the government has proved beyond a reasonable doubt the 'five specific facts,' called elements." *Id.* Although the instruction then went on to discuss only one of those elements, it did so in conjunction with the larger point of the supplemental instruction—to clarify the difference between a RICO *count* and a racketeering *act*. Given that context, and the Court's clear statement that the original RICO instruction remained in effect, the Court cannot find any actual prejudice from the supplemental instruction's discussion of the RICO elements.

17

When the Court first sent the jury out of the courtroom after closing arguments, it made clear that deliberations would not begin until the jury arrived at a room beneath the courtroom where the evidence was being kept. *See* ECF No. 682 at 232 (asking that the jury "go back into the jury room for a minute" to grab any "personal stuff you have there," and informing them that "whenever I tell the marshal to take [you] downstairs . . . you will begin your deliberations). The Court then brought the jury, minus juror Smith, back into the courtroom to clarify its conspiracy instruction. *Id.* at 238-39. At that time, the jury asked the Court about a problem, to which the Court responded that the jury would have to write out its concerns. *Id.* at 239. When juror Smith emerged from the restroom, the Court sent the jury to its deliberations room, but only to write down its concerns, *not* to begin deliberations. *Id.* The Court expressly directed the marshal to return the jury to the courtroom when they finished the note. *Id.* at 239-40. Sure enough, in the time it took to fill in five pages of transcripts, the marshal brought the jury back. *Id.* at 245.

Every indication from the record is that the jury began its deliberations sometime after the dismissal of juror Smith and substitution of an alternate. On the other hand, nothing suggests the opposite. In that light, the Court's failure to instruct the jury to restart deliberations was not error, much less error that caused actual prejudice.[15]

Bradley also claims that the Court's failure to give the alternate who replaced juror Smith the clarifying conspiracy instruction constituted prejudicial error. *See* ECF No. 1494 at 14-15. Although true that juror Frazier (Smith's replacement) never heard the Court's clarification of the bank robbery conspiracy example, it is not true, as Bradley claims, that Frazier thus "never received" instruction on the elements of conspiracy liability. The Court's original charge, which Frazier heard and had a written copy of,[16] made clear that a conspiracy conviction required the jury to find the commission of an overt act in furtherance of the conspiracy. *See* ECF No. 587 at 33-34. It simply is not true that Frazier never received instruction on the essential elements of conspiracy. In any event, the failure to give Frazier the clarifying instruction constituted harmless error. *See Trepal*, 684 F.3d at 1114 (holding errors are harmless when they do "not influence the jury or have but very slight effect").

Because the Court's supplemental RICO instruction, and responses to the jury's dictionary request and corporations question likely constituted actual prejudice, the Court must examine whether Bradley can demonstrate cause for not raising them on direct appeal. *See Ward v. Hall*, 592 F.3d 1144, 1176 (11th Cir. 2010).

---

[15] Because deliberations had not begun when the Court dismissed juror Smith, Bradley's claim of ineffective assistance of appellate counsel based on a failure to contest Smith's dismissal post-start of deliberations necessarily fails. *See* ECF No. 1494 at 15.

[16] Each juror had their own copy of the Court's instructions, which the Court gave them just before reading those same instructions into the record. The jurors all retained those written copies during deliberations.

### b. Cause

Bradley presents two theories of cause for his defaults. First, he argues that the delay in docketing the ex parte communications until after the jury reached its verdict and then backdating the docket entries made it effectively impossible for counsel to discover the jury communications-related claims he now presents that he failed to raise on direct appeal. *See* ECF No. 1494 at 13. And second, he argues that his trial and appellate counsel provided ineffective assistance in failing to discover the ex parte communications and failing to raise other jury-related issues trial counsel objected to. ECF No. 1494 at 13-15. Both theories, if proven, would support a finding of cause. *See Ward*, 592 F.3d at 1157.

i.    Impossible discovery

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with [a] procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Showing "that the factual or legal basis for a claim was not reasonably available to counsel . . . constitute[s] cause under this standard." *Id.* So, if Bradley can show that the clerk's office's docketing of the jury's dictionary request and the Court's unsolicited corporations note supplement made objections to them on appeal "not reasonably available," he will demonstrate cause for his

default and his claims will be evaluated on their merits.[17]

Bradley correctly notes that the clerk docketed both the dictionary note and corporations note supplement after trial ended and backdated them so they appeared on the docket as if they were docketed when they were actually sent. ECF No. 1497 at 38. No timely objection at trial could be made. But 542 days had passed from the time the clerk docketed the communications to the time Bradley filed his initial brief on direct appeal, more than enough time to discover and raise any issue with the notes before the Eleventh Circuit. *Compare* ECF No. 591, *with Initial Br. Appellant* at 1 *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) (No. 06-14934), 2007 WL 4540773.

Bradley argues that despite the long period of time between the docketing of the notes and his appeal that counsel had no reason to look for the notes because of the backdating. *See* ECF No. 1497 at 38. Maybe if counsel came to the docket without any knowledge of the case that would be true. But counsel walked out of trial fully aware of all filings to date. Then, a few days (at most a week) after the Clerk docketed the jury notes Bradley now complains about and two days after trial ended, Bradley's counsel received notice in the mail that the Clerk docketed those filings. *See, e.g.*, ECF Nos. 594; 595. At a minimum, Bradley had notice

---

[17] Bradley's and his counsel were well aware of the supplemental RICO instruction, even having objected to it before the Court gave it, and so the impossible discovery justification for procedural default does not apply to that instance of actual prejudice.

of the docketing more than a year before filing his brief on direct appeal.

Bradley makes it appear that the clerk docketed the jury notes surreptitiously without giving notice to anyone. If that were the case, Bradley's "not reasonably available" argument might have more force. But counsel had more than adequate notice and so that argument fails.[18]

### ii.    Ineffective assistance of counsel

Ineffective assistance may also be "cause for a procedural default." *Carrier*, 477 U.S. at 488. Bradley argues that trial counsel provided ineffective assistance by (1) not objecting to the dismissal of juror Smith on the basis that deliberations had already begun; and (2) not objecting that the Court failed to instruct juror Frazier after adding her to the jury when Smith departed.[19] Bradley also claims his appellate counsel provided ineffective assistance by (1) not presenting any argument on the prejudicial ex parte communications; (2) not contesting the conditions the jury served under; and (3) not raising any claims about the supplemental RICO instruction. ECF No. 1494 at 15.

Both Bradley's ineffective assistance of trial counsel claims fail. His argument about juror Smith fades to black because deliberations never began before Smith's dismissal from the jury. Objecting to the dismissal on grounds that deliberations had already begun would have made no sense.

Bradley's argument that trial counsel should have objected to the Court's failure to give juror Frazier the over act supplemental instruction also fails, but because that failure did not prejudice Bradley. As noted above, to show ineffective assistance, Bradley must prove both deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The prejudice prong requires "showing a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Deonarinesingh v. United States*, ___ F. App'x ___, No. 12-15803, 2013 WL 5763176, at *2 (11th Cir. Oct. 25, 2013) (quoting *Strickland*, 466 U.S. at 694).

Assuming Bradley's trial counsel's failure to object to Frazier not receiving the overt act clarification constituted deficient performance, Bradley does not show a reasonable probability of a different outcome absent that error. Regardless of whether Frazier heard the clarification, she heard the Court's original conspiracy instruction and had a written copy of it, both of which clearly stated that to convict on conspiracy, the jury had to find Bradley committed an overt act. Although Frazier hearing the clarification would have been preferable, her not hearing it does not so taint the original

---

[18] In defense of the clerk's office, it is worth noting that the docketing that occurred here is standard procedure. Although the clerk docketed the notes after trial ended, the notes were all received as filed on earlier days. It is the policy of the clerk's office not to docket such items while a trial is ongoing. Instead, docketing occurs at the end of trial when everything can be assembled in an orderly fashion.

[19] Bradley also makes a hedge-your-bets claim by stating that "if it is found that trial counsel should have discovered" the ex parte communications he believes deprived him due process and his right to be present then counsel's failure to discover them constituted ineffective assistance. ECF No. 1494 at 13-14. Since the Court did not find trial counsel should have discovered those communications before they appeared on the docket, it need not address Bradley's contingent ineffective assistance claim.

instruction to give rise to a reasonable probability that the jury would have acquitted Bradley of the conspiracy charges.

Bradley's ineffective assistance of appellate counsel claims also fail. Once again, counsel on appeal is not required to raise every non-frivolous issue. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Only if the ignored issues "are clearly stronger" than those counsel selects to appeal "will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Importantly, Bradley bears the burden of showing the unreasonableness of counsel's conduct. *Puiatti v. Sec'y, Fla. Dep't of Corrs.*, 732 F.3d 1255, 1279 (11th Cir. 2013).

Bradley fails to satisfy that burden. To review: Bradley's counsel on direct appeal presented four issues for review—(1) whether the government proved Bradley's guilty beyond a reasonable doubt and whether Bradley's conduct even constituted the charged crimes; (2) whether the dismissal of juror Smith violated Bradley's right to an impartial jury; (3) whether various evidentiary rulings and prosecutorial conduct denied Bradley a fair trial; and (4) whether the Court erred in sentencing Bradley to 300 months in prison. *See Initial Br. Appellant* at 1 *Bradley*, 2007 WL 4540773 at *1. Counsel apparently elected not to pursue claims related to ex parte jury instructions or the supplemental RICO instruction. That election, however, was not unreasonable.

The Court cannot say, and Bradley does not show, that the omitted issues are "clearly stronger" than those appealed. *Robbins*, 528 U.S. at 288. Bradley made factual innocence the centerpiece of his defense at trial.

Appealing on those grounds made all the sense in the world given his view of the evidence. Counsel also elected to challenge the dismissal of juror Smith more generally rather than attack the timing of the dismissal or the failure to instruct Smith's replacement. Although Bradley lost on that issue, the Court once again cannot say counsel's winnowing process lacked reasonableness.

So too for Bradley's appellate counsel's decision to forgo claims related to ex parte communications. Although several of those claims may have led to a reversal of Bradley's convictions if pursued successfully, the same can be said for the claims counsel in fact pursued. And, again, Bradley makes no showing that the ex parte communications claims' strength so exceeded that of the claims pursued that counsel's winnowing process was ineffective.

Whether or not Bradley suffered prejudice from his appellate counsel's failure to raise certain issues, counsel performed reasonably. Bradley therefore suffered no ineffective assistance of counsel. Despite the actual prejudice Bradley likely suffered from some of the jury-related errors that occurred at trial, he cannot show cause for his failure to raise on direct appeal the jury issues he pursues in this collateral attack. Counts Three through Six of Bradley's motion are *DISMISSED*.

### D. Bradley's Sentencing Claims

Bradley makes two claims related to his sentencing. First, Bradley argues that by not remanding for resentencing, the Eleventh Circuit "deprived Bradley of his

constitutional right under the Sixth Amendment to argue for a below-Guidelines sentence." *Id.* at 18. And second, Bradley contends that appellate counsel precipitated the Eleventh Circuit's error by providing ineffective assistance when counsel failed to argue in Bradley's petition for rehearing en banc that the Sixth Amendment mandated a remand for resentencing. ECF No. 1494 at 17.

### 1. *Bradley's Constitutional Rights Regarding Resentencing*

Before delving into Bradley's constitutional concerns, it is important to understand what he argued on direct appeal and, more importantly, how the Eleventh Circuit disposed of those arguments when it declined to remand. Bradley primarily attacked the Court's calculation of his Sentencing Guidelines total offense level. *See United States v. Bradley*, 644 F.3d 1213, 1283 (11th Cir. 2011).[20] The Eleventh Circuit agreed that the Court erred in applying two enhancements and reduced Bradley's total offense level from 46 to 40. *Id.* at 1285. Nevertheless, because the Court correctly applied an enhancement for amount of loss, the revised Guidelines total offense level of 40 still resulted in a recommended sentencing range that exceeded the statutory maximum for Count One of the indictment.[21] *Id.* Because the Court sentenced Bradley to

the statutory maximum on Count One, the errors in calculating Bradley's total offense level were harmless and did not warrant a remand for resentencing. *Id.*

Now, Bradley contends that when the Court originally sentenced him, it effectively departed downward from the Guidelines sentence for Count One by declining to impose consecutive sentences on other counts sufficient to result in the recommended Guidelines sentence. ECF No. 1497 at 43-45; *see* U.S. Sentencing Guidelines Manual § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment [recommended by the Guidelines], then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment [recommended]."). Given the recalculated total offense level, Bradley believes he has a constitutional right to argue for a downward departure from the new Guidelines range. ECF No. 1494 at 16 (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

As the Government points out, however, *Gall*, nor any other case the Court can locate, provides for a constitutional right to argue for a below-Guidelines sentence. All the Constitution requires is that the Guidelines be advisory because "[a]ny fact that, by law, increases the penalty for a crime . . . must be submitted to the jury and found beyond a reasonable doubt." ECF No. 1505 at 51 (quoting *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013)).

Even in cases like this one, where the sentencing court miscalculates the total

---

[20] Bradley made several other arguments regarding sentencing, none of which are relevant to the arguments he makes here.

[21] A total offense level of 46 resulted in a Guidelines range of life in prison for Count One. *See Bradley*, 644 F.3d at 1285. The statutory maximum, however, limited the sentence on Count One to 240 months. *Id.* Even after reducing the total offense level to 40, the recommended sentencing range of 292-365 months still exceeded the statutory maximum for Count One.

offense level, circuit courts need not remand for resentencing "if the [sentencing] court would have likely sentenced [the defendant] in the same way without error." *United States v. Scott*, 441 F.3d 1322, 1329 (2006). Remand is not appropriate when, as the Eleventh Circuit concluded here, "the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992).

So, if the Eleventh Circuit erred in failing to remand for resentencing, it did so when it concluded that that the Court's total offense level miscalculation was harmless. *See Bradley*, 644 F.3d at 1285 (holding that the Court's errors in applying two sentencing enhancements "were harmless"). But that error cannot give rise to relief under § 2255, which provides a remedy only if a sentence is imposed "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. An appellate court incorrectly concluding that a Guidelines miscalculation was harmless violates neither. Bradley's Sixth Amendment sentencing claim therefore is *DISMISSED*.

### 2. *Ineffective Assistance of Appellate Counsel – Sentencing*

Predicated on the existence of a constitutional right to argue for a lower sentence on remand, Bradley contends his appellate counsel provided ineffective assistance by not making that constitutional argument on direct appeal or in his petition for rehearing en banc. *See* ECF No. 1494 at 16-17.

As noted above, no such constitutional right currently exists, nor did one at the time of Bradley's direct appeal. And not making an argument based on a yet-to-occur extension of current law cannot be deficient performance. *See, e.g., Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000) (noting that attorneys are "not expected to foresee future new developments in the law") (quoting *Nelson v. Estelle*, 642 F.2d 903, 908 (5th Cir. 1981)). So, Bradley's ineffective assistance claim also fails.

### IV. CONCLUSION

Bradley's ineffective assistance of counsel claims related to materiality fail because he cannot show that either his trial or appellate counsels' decisions fell outside the range of professionally competent assistance. Bradley's jury related claims fail either because the errors involved were harmless or because he fails to show cause for not raising the issues on direct appeal. And finally, Bradley's sentencing claims fail because he had no constitutional right to argue for a lower sentence on remand. Because none of Bradley's claims prevail, he is not entitled to relief under § 2255 and his motion is *DENIED*.


This 5 day of December 2013.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA